Hernando WILLIAMS, Petitioner,

v.

James CHRANS and Neil F.
Hartigan, Respondents.

No. 87 C 02084.

United States District Court,
N.D. Illinois, E.D.

July 5, 1990.

Jerold S. Solovy, Jenner & Block, Chicago, Ill., petitioner.

Jack Donatelli, Asst. Atty. Gen., Criminal Appeals Div., Kevin Sweeney, Asst. States Atty., Criminal Appeals Div., Chicago, Ill., for respondents.

## MEMORANDUM OPINION
## AND ORDER

ASPEN, District Judge:

On April 13, 1978, petitioner Hernando Williams pled guilty to armed robbery, aggravated kidnapping, rape and murder. A jury later sentenced Williams to death. Williams now seeks habeas relief under 28 U.S.C. § 2254, challenging the voluntariness of his guilty plea, various aspects of his capital sentencing hearing and the constitutionality of the Illinois death penalty statute. For the reasons that follow, the petition is denied.

### I. Factual Background and Procedural History

On April 1, 1978, Williams was arrested for the murder, aggravated kidnapping, rape and armed robbery of Linda Goldstone. During police interrogation, Williams initially denied having committed the crimes, but after the police told Williams that his story did not check out, he gave a detailed confession. In *People v. Williams*, 97 Ill.2d 252, 262–64, 73 Ill.Dec. 360, 364–65, 454 N.E.2d 220, 224–25 (1983), *cert. denied*, 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984), the Illinois Supreme Court summarized the events as stated by Williams and corroborated at the capital sentencing hearing by evidence and testimony:

> [T]he victim, Mrs. Linda Goldstone, on March 30, 1978, was employed at Northwestern Memorial Hospital in Chicago as an instructor in the Lamaze method of childbirth. On that evening, as she was alighting from her car in the victinity [sic] of the hospital, she was approached by the defendant and robbed at gunpoint. He made her undress from the waist down. He then forced her into his car and, it appears, took her to a shop owned by his father. There he bound her hands and feet.

> He then forced her into the trunk of his car. With Mrs. Goldstone in the trunk, the defendant picked up his sister at work and drove her home. He then drove the victim to a motel, forced her inside and raped her.

> On the next day, with Mrs. Goldstone bound and locked in the trunk of the car, the defendant appeared at a suburban court where charges of aggravated kidnaping, rape and armed robbery were pending against him. The case was continued, and the defendant then drove to visit a friend, Nettie Jones, at her apartment. While he was there, people at the area heard cries for help coming from the trunk of his auto. Someone notified the police of the incident. The defendant drove away from a crowd that had gathered and proceeded to a tavern, where he visited other friends.

> Early that evening, the defendant checked into another motel. He forced Mrs. Goldstone into the motel and again raped her. Later, he forced her back into the trunk and picked up his niece at a friend's house and drove the niece

home. As he had done the day before, he drove his sister home from work and spent the evening visiting various taverns with friends.

In the meantime, police were searching for the defendant's car. The victim's husband, Dr. James Goldstone, a physician, after learning that his wife had not appeared for class that evening, notified the police of her absence. The victim's car was found by Northwestern University security officers. Early the following morning, Dr. Goldstone received a phone call from his wife in which she told him that she would be home soon. He heard a voice in the background say, "Shut up bitch, tell him you'll be home in about an hour." The victim asked Dr. Goldstone if he had called the police, and he told her to tell the man whose voice he had heard that he had not informed the police.

Officers investigating the incident at Jones' apartment obtained the license number of the car and learned that the defendant had visited Jones. The police searched the area for the auto without success and periodically watched the defendant's home, but the car was not located.

On April 1, at 6 a.m., the defendant released the victim from the trunk of the auto. He gave her $1.25 and instructed her to take a bus home and not to call the police. He then drove off. The victim, ignoring his instructions, ran to the porch of a nearby house for help. The person who came to the door refused to allow her to enter, but he did call the police. The defendant, who had only driven around the block to see whether his instructions would be obeyed, returned and ordered the victim off the porch. He then took her to an abandoned garage and killed her, shooting her in the chest and head. There was

medical evidence that the victim had been beaten once or more during her captivity.

The defendant was arrested at his home that afternoon while he was washing the trunk of his car.

At his arraignment in the Circuit Court of Cook County, Williams pled not guilty. As pretrial discovery proceeded, Williams filed a number of motions, including a motion to suppress the confession. Judge James E. Strunck denied the majority of Williams' key motions. On October 9, 1979, Williams changed his plea to guilty to one count each of murder, aggravated kidnapping, rape and armed robbery. The prosecution then formally requested a capital sentencing hearing, and Williams submitted his jury request.

The sentencing hearing began on November 19, 1979. In the eligibility phase,[1] the jury found that the state had proven beyond a reasonable doubt the existence of four statutory aggravating factors—that Williams murdered Linda Goldstone in the course of three other felonies and that he murdered an eyewitness to his crimes. At the conclusion of the aggravation/mitigation phase, in which Williams testified on his own behalf, the jury unanimously found that there were no mitigating factors sufficient to preclude the imposition of the death sentence. On March 14, 1980, the court accordingly sentenced Williams to death.

As provided by ¶ 9–1(i) of the death penalty statute, Williams appealed directly to the Illinois Supreme Court. The court rejected each of Williams' claims and affirmed the guilty plea and sentence. *Id.* Williams next filed a post-conviction petition in the Circuit Court of Cook County under Ill.Rev.Stat. ch. 38, ¶ 122–1, *et seq.* (1983). The trial court denied the petition without a hearing and the Illinois Supreme Court affirmed. *People v. Williams*, 109 Ill.2d 391, 94 Ill.Dec. 429 488 N.E.2d 255 (1985), *cert. denied*, 478 U.S. 1022, 106

---

1. As detailed more fully later in this opinion, the Illinois death penalty statute provides for a bifurcated capital sentencing hearing. In the first phase, the eligibility phase, the government must prove the existence of at least one of seven aggravating factors beyond a reasonable doubt.

In the second phase, the aggravation/mitigation phase, the state presents evidence of and argues any aggravating factor and the defendant presents evidence of and argues any mitigating factors. Ill.Rev.Stat. ch. 38, ¶ 9–1 (1977).

S.Ct. 3340, 92 L.Ed.2d 744 (1986). Having exhausted all available state remedies in satisfaction of 28 U.S.C. § 2254(b), Williams filed this habeas petition raising all of the federal claims that he argued in the state courts as well as some new claims. Illinois has stayed execution pending the final disposition of this petition.

## II. Constitutionality of Williams' Guilty Plea

The Cook County Public Defender's Office assigned four attorneys to represent Williams. They initially agreed that Williams should continue to plead not guilty and proceed to trial.[2] The defense team hired a psychologist and psychiatrist to assist in jury selection and to assess both Williams' competency to stand trial and the merits of an insanity defense. After the trial court denied key defense motions, including the motion to suppress the confession, defense counsel determined that there was little chance of acquittal and that Williams would be best served by a guilty plea and a strong defense at the capital sentencing hearing. They accordingly persuaded Williams to enter a guilty plea. In his affidavit, Williams describes the day before trial:

> [One of my attorneys] came to visit me. He continued to press me to enter a guilty plea. I did not want to do that. He repeatedly told me that I was hurting my family by holding out, that the only way to spare them was to plead and that I would die if I did not plead. Finally, against my will, I agreed to enter a guilty plea.

One of the attorneys describes their method of persuasion:

> As a response to our client's position, the four of us as well as [the psychologist] attempted to pursuade [sic] the defendant that a plea of not guilty would be a mistake. These conversations were not discussions of trial strategy, nor were they reminiscent of the numerous occasions in which I pursuaded [sic] a client to plead guilty to accept the plea

bargain being offered by the State. In this case the psychological pressure and the sophisticated tactics used with Hernando Williams to convince him to adopt our approach were unlike any other conversations I ever had with any other client. Also, it goes without saying, that in this case there were no plea bargaining offers from the State.

> All of the psychiatric and psychological information which had been gathered and developed by [the doctors] was used by me and my associates to compel Mr. Williams to accept our point of view. This constituted a unique form of coercion. We took advantage of our client, maximizing the use of the information we had gathered for a purpose other than which it was intended. Our strategy was developed to accommodate us and not our client. There is no question that during this period (which lasted over a year) we did not act in accordance with our client's wishes. Rather, we used every means available to force him to change his plea.

> Mr. Williams ultimately gave in to this extreme pressure shortly before the trial was to begin.

Williams claimed in the state courts that he entered the plea unintelligently because he was unaware that the death penalty was an option after a guilty plea. The Illinois Supreme Court denied the claim, finding that the trial court told him numerous times that he could be subject to the death penalty, and there was no evidence that he was informed otherwise. *Williams*, 97 Ill.2d at 268–70, 73 Ill.Dec. at 367–68, 454 N.E.2d at 227–28. In this petition, Williams raises four new challenges to his plea: his trial attorneys coerced him into entering the guilty plea; their conduct constituted ineffective assistance of counsel; appellate counsel was incompetent in failing to raise these claims on direct appeal; and post-conviction counsel was similarly incompetent in failing to raise them in the post-conviction petition.

---

**2.** We take as true for purposes of this claim all of the allegations contained in submitted affida- vits.

## A. Waiver

Ordinarily, a federal habeas petitioner forfeits the right to challenge a conviction or sentence on grounds not raised in the state courts. *United States ex rel. Villa v. Fairman*, 810 F.2d 715, 717 (7th Cir.1987). We will, however, excuse the forfeiture of a claim if the petitioner demonstrates cause for failure to raise the claim and prejudice therefrom, *Reed v. Ross*, 468 U.S. 1, 11, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1 (1984), or that the alleged constitutional errors seriously undermined the guilt determination. *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2650, 91 L.Ed.2d 397 (1986). These principles apply in capital cases as in any other. *Riley v. Wainwright*, 778 F.2d 1544, 1551 (11th Cir. 1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986).

In seeking to overcome waiver, Williams contends that appellate and post-conviction counsel's incompetence should excuse his failure in the state courts to challenge the plea as coerced. Ineffective assistance of appellate counsel may excuse a procedural default if it rises to the level of a violation of the Sixth Amendment; that is, counsel's performance fell below an objective standard of professional competence, and the defendant was thereby prejudiced. *Murray*, 106 S.Ct. at 2646; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellate counsel's decision not to raise these challenges to the guilty plea was reasonable in that claims requiring further factual findings are cognizable only in post-conviction proceedings. *See generally People v. Edwards*, 74 Ill.2d 1, 23 Ill.Dec. 73, 383 N.E.2d 944 (1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979). Accordingly, that decision does not excuse waiver.[3]

On the other hand, post-conviction counsel's decision not to raise these challenges was unreasonable. The affidavits indicate that post-conviction counsel believed incorrectly that Williams could not raise the claims in collateral proceedings because he did not raise them on direct appeal. An Illinois court would have addressed the merits of Williams' new challenges to his plea. *See, e.g., People v. Coultas*, 75 Ill.App.3d 137, 139 n. 1, 31 Ill.Dec. 110, 111 n. 1, 394 N.E.2d 26, 27 n. 1 (5th Dist.1979). Thus, Williams procedurally defaulted his claims solely on account of post-conviction counsel's mistaken interpretation of Illinois law.[4] Nevertheless, post-conviction counsel's ineffective assistance provides neither an independent basis for habeas relief nor cause to excuse Williams' procedural default. Since there is no constitutional right to post-conviction counsel, *Pennsylvania v. Finley*, 481 U.S. 551, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987), there is no right to competent counsel when the state elects to provide a lawyer in post-conviction proceedings. *Cf. Wainwright v. Torna*, 455 U.S. 586, 587–88, 102 S.Ct. 1300, 1301, 71 L.Ed.2d 475 (1982) (holding that in the context of a discretionary appeal before a state's highest court, "[s]ince [the defendant] had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel ..."). Moreover, Williams waived any claim of ineffective post-conviction counsel when he failed to raise it on the appeal of the denial of his post-conviction petition. Accordingly, Williams waived these claims by failing to raise them in the state courts and has not demonstrated cognizable cause to excuse the procedural default.

## B. Williams' Coerced Plea and Ineffective Trial Counsel Claims

In any event, the claim of coercion lacks merit. While threats or misrepresentations may invalidate a guilty plea, *United States v. Jordan*, 870 F.2d 1310, 1316 (7th Cir. 1989), *citing Brady v. United States*, 397

---

3. For this reason, we also deny Williams' independent claim that appellate counsel's performance fell short of Sixth Amendment standards.

4. Respondents contend that post-conviction counsel was not incompetent in failing to raise this challenge to Williams' plea because the claim has no merit. When counsel has explained a decision, we will evaluate the decision for Sixth Amendment purposes solely on that basis.

U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970), the competent advice of counsel, however strongly presented, does not constitute undue coercion or ineffective assistance of counsel. *Lunz v. Henderson,* 533 F.2d 1322, 1327 (2d Cir.), *cert. denied,* 429 U.S. 849, 97 S.Ct. 136, 50 L.Ed.2d 122 (1976). The attorneys concluded on the merits and in their best judgment that a guilty plea was in Williams' best interest. There is no reason to question that conclusion. Williams' detailed confession survived the motion to suppress and a conviction seemed inevitable. The attorneys did not promise Williams that a guilty plea would spare him the death penalty. They talked in probabilities, not certainties. Williams' characterization to the contrary notwithstanding, the affidavits suggest nothing more than verbal persuasion. The attorneys never threatened Williams or his family. Williams declared numerous times during the plea proceedings that his plea was voluntary and not the product of any threats or promises from the prosecution, his attorneys or prison officials. Transcript of Proceedings ("Tr.") V. 3, 15–16. A strong presumption of veracity accompanies such statements in open court. *Politte v. United States,* 852 F.2d 924, 931 (7th Cir.1988); *Worthen v. Meachum,* 842 F.2d 1179, 1183–84 (10th Cir.1988).

▮ Our conclusion that Williams' plea was voluntary and intelligent is further reinforced by the record of the plea proceedings as a whole. The objective facts on the record prevail over the defendant's later recollection of subjective feelings of coercion. *United States ex rel. Robinson v. Housewright,* 525 F.2d 988, 991–92 (7th Cir.1975). Generally, the court receiving a plea must be reasonably assured that the defendant understands the nature of the charges to which he is admitting guilt, the most severe sentence to which a plea exposes him and that the waiver of certain constitutional rights—including the right to a jury trial, the privilege against compulsory self-incrimination and the right to confront one's accusers—accompanies the plea. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *McCarthy v. United States,* 394 U.S. 459, 466–67, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *Worthen,* 842 F.2d at 1182. Williams admitted to all of the facts underlying the charges against him. The court stated that the death penalty accompanied the murder charge. Williams' attorney evidenced an understanding to this effect when he stated that admissions to the facts in no way constituted a stipulation to the existence of any aggravating factors for sentencing purposes. Finally, the court informed him of each of his trial rights, and Williams indicated that he understood them and was willing to waive them. In short, the trial court conducted an extensive and constitutionally-satisfactory plea proceeding before accepting Williams' plea, and Williams has not given us reason to question the voluntariness of that plea.[5]

### III. Constitutionality of the Sentencing Hearing

### A. The Prosecution's Use of Victim Impact Evidence

During both phases of the sentencing hearing, the court allowed certain testimony that Williams characterizes as inadmissible victim impact evidence under *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). A probation officer recited the following portion of a presentence investigation report:

> Personal injury was death. The financial losses are not measurable. The victim, Linda Goldstone, was a 29–year–old mother of a 3–year–old son, the wife of a doctor. The impact that this crime had upon her immediate family, not to men-

---

5. Our decision should not be construed as condoning defense counsels' methods which may very well have exceeded the bounds of ethical norms. Counsel admitted that they used the information contained in Williams' psychological evaluation as a tool in their effort to persuade Williams to plead guilty, a use not originally intended. More troubling, counsel stated that their strategy was developed to accommodate themselves, not their client. We hold only that their decision to recommend a plea was sound and that Williams was not coerced in any constitutionally significant way. Other aspects of counsel's conduct may require further consideration by the Illinois Attorney Registration and Disciplinary Commission.

tion the parents of this woman, cannot be adequately put into words. The grief and sorrow inflicted upon them by this one man's deed is sufficiently aggravating to justify imposition of the death penalty. The loss of this woman to society will go unmeasured in time. She was on her way to teach a course in the Lamaze method of childbirth when her— when Williams abducted her. The irony is apparent. A woman and her husband, an obstetrician, devoted to assisting in giving life. A criminal bent upon taking it away.

Tr. 4377. Dr. Goldstone, the victim's husband, testified as to Linda Goldstone's educational background and explained her decision to become a Lamaze instructor. The court allowed Aline Krone and her mother to testify about a previous rape for which Williams was convicted. During closing arguments, the prosecution referred to Linda Goldstone's work, how the selection of her profession evidenced a commitment to life and that her husband loved her.[6]

■ Throughout the sentencing hearing and on appeal, Williams challenged this evidence and these arguments as irrelevant, inflammatory and prejudicial. By raising it in those terms, Williams fairly alerted the state courts to his claim and did not waive it for federal habeas purposes. *Booth* was decided four years after Williams completed his direct appeal. The rationale underlying *Booth* is identical to the arguments Williams presented in his state court challenges. Accordingly, the objections Williams raised preserved the federal basis of his claim. *Gilmore v. Armontrout,* 861 F.2d 1061, 1068 n. 14 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). *See also Evans v. Cabana,* 821 F.2d 1065, 1070 (5th Cir.1987) (trial counsel's objections to victim impact evidence on the grounds of relevancy and prejudice did not constitute ineffective assistance of counsel since there was little more that the attorney could argue in a trial held six years before the *Booth* decision). *See generally Gill v. Duckworth,* 653 F.Supp. 877, 878 (N.D.Ind.), *aff'd without opinion,* 836 F.2d 552 (7th Cir.1987).

#### 1. Retroactivity of the *Booth* Decision

As a threshold challenge to Williams' claim, respondents contend that *Booth* should not apply in this collateral attack on the sentencing hearing since *Booth* was decided three years after Williams' conviction and death sentence became final after direct review in 1984.[7] The United States

---

**6.** Specifically, the prosecution argued that

Linda Goldstone was affectionately known to her family and friends as Lindy.... I also want to talk to you a little about the contrast of the tools, the tools of the trade of both of these people ...

\* \* \* \* \* \*

This is that portfolio of Linda Goldstone's, the one she never got to use for those students at Northwestern that night, tools of her trade, the obstetrical forceps, the chart that she used as an aid for helping people bring life into the world.

\* \* \* \* \* \*

Linda Goldstone held life as something which is precious. She lived her life in an attempt to make a contribution to others, she helped others who were about to bring life into this world make that experience more meaningful and easier for them. That is called the Lamaze method of childbirth.

\* \* \* \* \* \*

[T]hink about Meg Ellis, Meg is Jim Goldstone's sister.
Bring yourselves back, ladies and gentlemen, to their home, their home the night that they spend waiting, wondering what happened to Linda ...

\* \* \* \* \* \*

A beautiful woman; an absolute flower. He loved her. "I love you." Think of those words of affection and feelings and love.... Think about that, ladies and gentlemen; think about Jim and Linda Goldstone, obstetrician and the teach [sic] of Lamaze, dedicated to the proposition of giving life, love, and the irony is so damned apparent, the criminal bent upon taking life away. Here are their tools, the forceps, assisting in bringing a child into a mother's arms, and his tool, a gun, which has now taken that same child away from her mother's arms. Think of that contrast when you deliberate.

Tr. 4152–56, 5447–48.

**7.** The question whether *Booth* should be applied retroactively on collateral review apparently has not yet been addressed by any federal court. There are several federal decisions that effectively retroactively applied *Booth,* but without directly confronting the issue whether retroactive application was appropriate. *See, e.g., Rushing v. Butler,* 868 F.2d 800 (5th Cir.1989)

Supreme Court has held that a "new rule" of federal constitutional law cannot apply in cases on collateral review, including capital cases, unless the rule comes within one of two narrow exceptions. *Saffle v. Parks,* — U.S. —, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). *See also Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Penry v. Lynaugh,* — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[8] The threshold question for our consideration therefore is whether *Booth* is a new rule within the meaning of the Supreme Court's evolving standard of retroactivity.

Not long ago, the Supreme Court concluded that a particular decision will not be considered a new rule if it "simply applied a well established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." *Yates v. Aiken,* 484 U.S. 211, 108 S.Ct. 534, 537, 98 L.Ed.2d 546 (1988), *quoting Desist v. United States,* 394 U.S. 244, 263, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).[9] More recently in *Butler v. McKellar,* — U.S. —, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990), the Court provided an additional "functional" gloss to the new rule inquiry: "The 'new rule' principle ... validates reasonable, good faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." If the question whether prior well established precedent should apply to a new factual scenario is "susceptible to debate among reasonable minds," then such an application will be regarded as a "new rule" and not given retroactive effect unless it falls within one of the two narrow exceptions. *Id.* The Supreme Court, however, has yet to provide a clearer framework for demarcating the line between a closely analogous application of facts to constitutional principle and an application that is susceptible to debate among reasonable minds. Indeed, the Court has acknowledged that "[i]n the vast majority of cases, ... where the new decision is reached by an extension of the reasoning of previous cases, the inquiry will be more difficult." *Butler,* 110 S.Ct. at 1216.

■ The Supreme Court has articulated and reiterated a variety of formulations of the inquiry. A case announces a "new rule" when it breaks new ground or imposes a new obligation on the States or the Federal Government. *Teague,* 109 S.Ct. at 1070; *Penry,* 109 S.Ct. at 2944; *Butler,* 110 S.Ct. at 1216. "Put differently, and, indeed, more meaningfully for the majority of cases, a decision announces a new rule 'if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.' " *Butler,* 110 S.Ct. at 1216 (quoting *Teague,* 109 S.Ct. at 1070; *Penry,* 109 S.Ct. at 2944). *See also Saffle,* 110 S.Ct. at 1260 ("[O]ur task is to determine whether a state court considering [the defendant's] claim at the time of his conviction would have felt compelled by existing

(vacating death sentence on *Booth* grounds even though direct appeal in case became final in 1985); *Byrne v. Butler,* 845 F.2d 501 (5th Cir. 1988) (direct appeal final in 1984); *Gilmore v. Armontrout,* 861 F.2d 1061 (8th Cir.1988) (direct appeal final in 1983). *See also Hayes v. Lockhart,* 881 F.2d 1451 (8th Cir.1989) (on remand from Supreme Court, — U.S. —, 109 S.Ct. 3181, 105 L.Ed.2d 691 (1989), retroactively applying *Gathers* and vacating death sentence even though direct appeal became final in 1983). *See also, Farmer v. Sumner,* — U.S.—, 109 S.Ct. 1331, 103 L.Ed.2d 599 (Marshall J., dissenting) ("I believe that the issue of whether *Booth* should have retroactive operation very much warrants this court's attention.") At least two state supreme courts have addressed the question whether *Booth* should be given retroactive effect and have reached different conclusions. *See Jackson v. Dugger,* 547 So.2d 1197 (Fla.1989)

(retroactively applying *Booth* in state post-conviction collateral review); *Nebraska v. Reeves,* 453 N.W.2d 359 (1990) (refusing to retroactively apply *Booth* in state post-conviction collateral review).

8. This standard for retroactivity was first implemented by a plurality of the Supreme Court in *Teague* (O'Connor, Rhenquist, Scalia, Kennedy), and then later adopted by a majority in *Penry* and subsequent cases (O'Connor, Rhenquist, White, Scalia, Kennedy).

9. *See also United States v. Johnson,* 457 U.S. 537, 549, 102 S.Ct. 2579, 2586, 73 L.Ed.2d 202 (1982) ("[W]hen a decision of this court merely has applied settled precedents to new and different factual situations, no real question has arisen as to whether the later decision should apply retrospectively.").

precedent to conclude that the rule [sought] was required by the Constitution.") The fact that a court says that a rule falls within a prior precedent's "logical compass," or that it is "controlled" or "governed" by prior decisions is not conclusive on the question. *Butler,* 110 S.Ct. at 1217. Though these various formulations may direct the inquiry as to whether a "new rule" has been announced, the guidance they provide does not offer a conclusive basis for that determination. Thus, we shall examine the outcome of several Supreme Court decisions on the issue.

In *Yates,* decided shortly prior to the *Teague* line of cases, the Court unanimously determined that *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), did not announce a new rule but was "merely an application of the principle" that governed the Court's decision in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). *Yates,* 484 U.S. at 216–17, 108 S.Ct. at 538. The Court determined that the doctrine against burden-shifting presumptions set out in *Franklin* falls within *Sandstrom*'s proscription against conclusive presumptions or instructions which shift the burden of persuasion in criminal trials. Thus, the South Carolina Supreme Court's determination to the contrary in *Yates* was not the sort of decision that would have been susceptible to a debate among reasonable minds, at least as far as the unanimous United States Supreme Court was concerned.

More problematic, however, is how, or whether, the reasonable interpretation standard may be applied when only a majority of the Court renders the decision sought to be given retroactive effect. For example, in *Penry,* the petitioner sought a rule which would require a Texas court, upon request, to give jury instructions that would make it possible for the jury to give effect to mitigating evidence of mental retardation and abused background. A five-member majority of the Court found that the rule *Penry* sought was not a new rule because it was dictated by the more gener-

al principle announced in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) that

> a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to circumstances of the offense that mitigates against imposing the death penalty.

*Penry,* 109 S.Ct. at 2946 (O'Connor, Brennan, Marshall, Blackmun, Stevens).[10] Yet, four Justices dissented, believing that the application of prior precedent sought and obtained in *Penry* constituted a "new rule" and therefore should not be given effect. Assuming the dissent reflected an interpretation of existing precedent about which reasonable minds may differ, then under the reasonable interpretation standard, the mere fact of a dissent within the court should itself have trumped the substantive determination of the majority that the rule sought is not a "new rule." That, however, was not the holding of *Penry.*

Similar to *Penry,* by 1983, when the Illinois Supreme Court ruled on Williams' direct appeal, it was well settled that the state cannot submit evidence that is not relevant to the character of the defendant and the circumstances of the crime for which the defendant faces the death penalty. *Booth* merely applied this principle to a specific type of evidence—victim impact evidence. "The Supreme Court's decision in *Booth* ... merely reiterates what the Supreme Court has previously held: The Eighth Amendment requires that sentencing in a capital murder case must focus on the individualized character of the defendant and the particular circumstances of the crime." *Thompson v. Lynaugh,* 821 F.2d 1080, 1082 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987) (finding counsel's failure to raise the issue not excused merely by virtue of the fact that *Booth* was decided later). We therefore find, consistent with *Penry,* that

10. Both *Eddings* and *Lockett* had been decided prior to Penry's conviction becoming final.

even though only a majority of the court may have rendered the decision in *Booth,* it nonetheless may be construed as not having announced a new rule. The fact that there was disagreement in the court as to the validity of a specific application of a more general principle does not in and of itself mean that the rule adopted was either a break with prior law or not compelled by existing precedent.

■ Further, even assuming that *Booth* did announce a "new rule," the rationale underlying *Booth* and the precedent upon which it is based goes directly to the "truthfinding" function of the capital sentencing hearing—whether death is the appropriate punishment—such that the rule in *Booth,* as an application of the landmark cases that preceded it, would properly come within the second exception to the non-retroactivity doctrine. That exception "is for 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 110 S.Ct. at 1257 (citations omitted). The Court in *Booth* found that the victim impact evidence about which the defendant had no reason to be aware is totally irrelevant to the sentencing process. *Booth,* 107 S.Ct. at 2533. The admission of victim impact evidence "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.* Because such evidence may inflame the jury and divert it from deciding the case on relevant evidence concerning the crime and the defendant, its admission necessarily calls into question the accuracy of the sentencing decision as being "based on reason rather than caprice or emotion." *Id.* at 2536, *quoting Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (opinion of Stevens, J.). The rule in *Booth* was announced precisely because the admission of victim impact evidence would "seriously diminish the likelihood of obtaining an accurate conviction [or sentence]"—the fundamental reason for applying the second exception. *See Teague,* 109 S.Ct. at 1077. A

death verdict that turns upon the admission of such evidence must be considered constitutionally flawed. For these reasons we find that *Booth* should be given retroactive effect in this case.

### 2. The Merits of Williams' Claim

■ In *Booth,* the Court held that the victim impact statement that the prosecution introduced into evidence during a capital sentencing hearing "create[d] a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 503, 107 S.Ct. at 2533. The long and detailed statement that was the subject of *Booth* contained references to the personal characteristics of the victim, the emotional impact of the crimes on the victim's family and the family members' opinions of the crimes. The Court was careful to note that victim impact information may be constitutionally permissible if the defendant was aware of that information before committing the crime: "[A] defendant's degree of knowledge of the probable consequences of his actions may increase his moral culpability in a constitutionally significant manner." *Id.* 107 S.Ct. at 2534. The Court recently reaffirmed these principles in *South Carolina v. Gathers,* —— U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).[11] There, the Court overturned a death sentence because the prosecution read to the jury a religious prayer card that the victim possessed at the time of the murder. The Court expressly noted that the contents of the prayer card were irrelevant to the circumstances of the crime because there was no evidence, and it was unlikely, that the defendant ever read that card. *Id.* 109 S.Ct. at 2211.

■ Even under *Booth,* however, a death sentence will not be overturned based simply on the admission of constitutionally-suspect victim impact evidence. Rather, the courts apply what amounts to a harmless-error analysis, assessing the risk

---

11. While a majority of the *Gathers* Court suggested that *Booth* should be overruled, Justice O'Connor declined to do so because in her opin-
ion the death sentence should have been upheld even under the *Booth* standard. 109 S.Ct. at 2212.

that the sentencing authority imposed the death sentence on improper grounds. For example, in *Bryne v. Butler,* 845 F.2d 501, 511 (5th Cir.), *cert. denied,* 487 U.S. 1242, 108 S.Ct. 2918, 101 L.Ed.2d 949 (1988), the court held that the prosecution's "several oblique references" to the victim's family and the victim's character as a "caring and decent individual" did not warrant reversal of a death sentence especially in light of a limiting instruction. *See also, Gilmore v. Armontrout,* 861 F.2d 1061, 1069 (8th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989) (two questions concerning how the victim occupied herself and what her spirits were like, the objections to which were sustained before the witness's answers did not warrant reversal); *Coleman v. Saffle,* 869 F.2d 1377, 1394–96 (10th Cir.1989). *Compare, Gathers,* 109 S.Ct. 2207 (prosecutor's closing argument, drawing extended inferences regarding the personal characteristics of the victim, held to violate *Booth* ); *Jackson v. Dugger,* 547 So.2d 1197 (Fla.1989) ("We cannot say beyond a reasonable doubt that the jury would have recommended a sentence of death had it not heard the victim impact evidence presented here.").

■ We find that the victim impact evidence that Williams' sentencing jury heard did not render his death sentence unconstitutional. A significant portion of that evidence related directly to the circumstances of the crime and Williams' moral culpability, and therefore is not constitutionally suspect. The record suggests Williams was aware that Linda Goldstone was a mother and that she taught Lamaze at Northwest-

ern University. After he kidnapped her, he asked her where she had been going.[12] Williams later ordered her to telephone her husband, and he overheard the conversations that she had with her husband and her sister.[13] Despite that knowledge, he was still able to party with his friends while Linda Goldstone was in captivity in the trunk of his car.[14] Finally, most of the testimony of Aline Krone and her mother involved the details and circumstances of Aline's rape.

The remaining bits of victim impact evidence to which Williams directs our attention are constitutionally suspect. We are most concerned with the probation officer's statement that "[t]he grief and sorrow inflicted upon [the victim's family] by this one man's deed is sufficiently aggravating to justify imposition of the death penalty." [15] Yet, given the overwhelming amount of admissible aggravating evidence and the court's instruction admonishing the jury to avoid passion and sympathy in its decision, we are nevertheless confident that this limited testimony had an insubstantial impact on the jury's decision. It did not so infect the sentencing hearing as to create a constitutionally impermissible risk that the jury sentenced Williams to death on other than relevant evidence and argument.

### B. The Prosecution's Use of Peremptories to Exclude Blacks From the Jury

■ Williams is black and was sentenced to death by an all-white jury. The jury was selected from a venire of 130 members, twenty-eight of whom were

**12.** "I questioned her about, you know, where she was going and stuff like that." Tr. 3726.

**13.** "I told her to tell her husband that she is all right and that she would be home in an hour or so. After she made the phone call she got back in the car and I asked her what did her husband say and she told me that, you know, he was worried about her and stuff like that." Tr. 3728. "I heard everything she said and I could hear some of the things he was saying." Tr. 3729.

**14.** On cross-examination, Williams stated that he knew that Linda Goldstone was married and had a child; but he still had "a good time" when he was with his friends in a tavern and she was in the trunk of his car. Tr. 5064.

**15.** Additionally, Aline Krone's mother testified as to the impact of the rape on Aline's life:

Q. At the time, on May 13, 1977, was your daughter married?
A. Yes, sir.
Q. What happened after that period of time?
A. Her husband couldn't no longer stand to be with her, and he divorced her.
Q. Would it be fair to say, Mrs. Davis ... that your daughter's life was devastated by this rape?
A. Yes, sir.
Tr. 4262.

black. Williams and the state successfully challenged seventeen of the black venire-members for cause and the state peremptorily challenged the remaining eleven. Williams contends that the prosecution used those peremptories solely on the basis of the veniremember's race in violation of the equal protection clause under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[16]

### 1. Williams' Equal Protection Claim Under *Swain*

■ The Supreme Court recognized in *Swain* that the equal protection clause assures blacks the same right to serve on petit juries that whites enjoy. A defendant may enforce this right on behalf of those individuals whom the prosecution excluded on the basis of race. The defendant may not, however, rely exclusively on the prosecution's misconduct in any particular case but must instead show that the prosecution in case after case systematically and purposefully exercised its peremptory challenges against blacks. 380 U.S. at 223, 85 S.Ct. at 837. *See also Teague v. Lane*, 820 F.2d 832, 835 (7th Cir.1987), *aff'd*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). At a minimum, the defendant must demonstrate that

the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who survived challenges for cause, with the result that no Negroes ever serve on petit juries.... Such proof *might* support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial.[17]

(Emphasis added.) 380 U.S. at 223–24, 85 S.Ct. at 837–38.

Williams proffers the following data to support his claim: a study by Professor Hans Zeisel of the University of Chicago Law School; a breakdown of the racial composition of juries in thirty-two Cook County sentencing hearings in which a black defendant was sentenced to death; a survey by the Chicago Tribune of thirty-one Cook County felony trials during July 1984; and ten cases in which the Illinois Supreme Court remanded for a *Batson* hearing. Individually or together, this evidence does not satisfy the evidentiary burden outlined in *Swain*.

Professor Zeisel analyzed seventeen cases prior to May of 1982 in which a Cook

**16.** Williams additionally seeks relief on these facts under the Eighth and Sixth Amendments. Williams failed to raise the Eighth Amendment claim in the state courts. In opposition to application of the waiver doctrine, Williams contends that respondents waived their waiver argument by failing to raise it in their initial brief. We disagree. Williams' initial brief referred to the Eighth Amendment only in the heading to its claims regarding the state's use of peremptory challenges. The state was reasonable in challenging that claim only after Williams explained it in his later brief. Further, Williams has been given adequate opportunity to respond to the waiver argument. As to his Sixth Amendment claim, the Seventh Circuit has held that the right to an impartial jury does not guarantee a petit jury that fairly represents a cross-section of the community. *Teague v. Lane*, 820 F.2d 832. The rationale of *Teague* applies equally in a capital sentencing hearing. Application of the Sixth Amendment fair-cross section requirement to the selection of the petit jury would effectively undermine the use of peremptory challenges, a

mechanism that aids the defense as much as the state, without contributing appreciably to the jury's impartiality. *See id.* at 839–43.

**17.** Indeed, the following evidence was deemed insufficient in *Swain* to prove an equal protection violation:

[W]hile Negro males over 21 constitute 26% of all males in the county in this age group, only 10 to 15% of the grand and petit jury panels drawn from the jury box since 1953 have been Negroes, there having been only one case in which the percentage was as high as 23%. In this period of time, Negroes served on 80% of the grand juries selected, the number ranging from one to three. There were four or five Negroes on the grand jury panel of about 33 in this case, out of which two served on the grand jury which indicted petitioner. Although there has been an average of six to seven Negroes on petit jury venires in criminal cases, no Negro has actually served on a petit jury since about 1950. 380 U.S. at 205, 85 S.Ct. at 827–28.

County jury sentenced a black person to death. In ten of those cases, the prosecution peremptorily excluded 96% of the black members of the venire but only 28% of the whites. Nine of the seventeen juries were all-white. Seven had one black member and one had four. The glaring deficiency in the Zeisel study is that it fails to consider those cases in which the jury did not impose the death sentence on a black defendant; thus lacking evidence essential to a determination of whether blacks are denied the right to serve on capital sentencing juries.

The thirty-one case breakdown demonstrates that 63% of the black defendants that were sentenced to death by a jury in Cook County prior to July 1984 were sentenced by all-white juries. In the absence of data from those cases in which the jury refused to impose the death sentence, this evidence suffers from the same problem as the Zeisel study. Further, Williams does not disclose how the prosecution's use of peremptories contributed to the final composition of those thirty-two juries.

The Chicago Tribune survey established that in thirty-one Cook County felony trials, the prosecution used 68% of its peremptories to exclude blacks from the petit juries when blacks made up only 29% of the venire. Chicago Tribune, Aug. 5, 1984, at 1. However, the same study indicated that 24% of the jurors who actually served were black, a number representative of the racial composition of the venire. *Williams,* 109 Ill.2d at 395, 94 Ill.Dec. at 431, 488 N.E.2d at 257.[18] Moreover, the pool of veniremembers to which Williams compares the 68% figure is misleading. He compares the

racial composition of the state's peremptories to the entire venire, before any challenges were made by either party. The appropriate pool consists of those veniremembers who remained after challenges for cause. If a significantly disproportionate number of whites were excluded for cause (or, for that matter, peremptorily by the defendant), then the percentage of blacks against which the prosecution was able to exercise its peremptories may well have been closer to 68%.

Finally, the fact that the Illinois Supreme Court found a prima facie *Batson* claim in ten cases does not demonstrate the systematic exclusion of blacks. In sum, the touchstone of a *Swain* claim is proof that the prosecution effectively disenfranchised the members of a racial minority by denying their right to serve as jurors in a particular type of case. Williams' evidence is fatally incomplete and accordingly does not establish or suggest that the prosecution has systematically and purposefully excluded blacks from serving on capital sentencing juries in Cook County or Illinois. At most, it suggests that predominantly white juries sentenced more blacks to death than juries constituted differently. That suggestion is not probative of the motivation that underlaid the prosecution's exercise of peremptory challenges in capital sentencing hearings systemwide.[19]

### 2. Williams' Equal Protection Claim Under *Batson*

Recognizing the difficulty of surmounting the burden of proof set forth in *Swain,* the Supreme Court held in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),[20] that a defendant's con-

---

**18.** A district court recently held that "the fact that on an average 29% of jurors serving on petit juries were Blacks rebutted the prima facie case of systematic exclusion." *Evans v. Thigpen,* 683 F.Supp. 1079, 1086 (S.D.Miss.), *aff'd sub nom. Evans v. Cabana,* 821 F.2d 1065 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 795 (1987).

**19.** Williams seeks discovery under Rule 6 of the Rules Governing Section 2254 Cases in the event his proffered evidence does not establish a *Swain* violation. Given the serious inadequacies in his statistical analyses, we do not consider this evidence sufficient to convince us that

"the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." *Willis v. Newsome,* 771 F.2d 1445, 1447 (11th Cir. 1985) (quoting *Harris v. Nelson,* 394 U.S. 286, 300, 89 S.Ct. 1082, 1091, 22 L.Ed.2d 281 (1969)), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986).

**20.** In their dissent to the denial of *certiorari* of Williams' direct appeal, Justices Marshall and Brennan presaged the *Batson* decision by noting that the *Swain* burden of proof effectively forecloses any meaningful challenge to the prosecution's racially-motivated peremptories.

viction will be reversed if the defendant proves that the state peremptorily excluded members of the defendant's race, that and any other relevant circumstances raise an inference that the prosecution acted with racially discriminatory intent, and that any of the state's neutral explanations are pretextual. The prosecution peremptorily excused all of the remaining blacks in the venire for Williams' sentencing hearing. Respondents' proffered justifications for each of these peremptory challenges are tenuous at best.[21] Nevertheless, Williams cannot prevail on this claim because the Illinois Supreme Court decided his direct appeal on May 27, 1983, approximately three years before the *Batson* decision, and *Batson* is not given retroactive effect in collateral proceedings.

In *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), the Supreme Court held that a defendant cannot challenge the prosecution's use of peremptories under *Batson* if direct appeals at all state court levels were completed by April 30, 1986, the date of the *Batson* decision. The Court reasoned that Batson was "an explicit and substantial break with prior precedent," *id.* at 258, 106 S.Ct. at 2880; that the decision served constitutional interests above and beyond the truthfinding function; that mechanisms such as challenges for cause were available to protect the defendant from racially-biased jurors; that law enforcement authorities have relied on *Swain;* and that the retroactive application of *Batson* would seriously disrupt the administration of justice. The Court did not suggest that its decision was in any way limited to non-capital juries. While the administrative nightmares which concerned the Court in *Allen* are not as apparent in the capital sentence context,[22] the other rationales the Court applied have equal force in the context of jury selection in capital sentencing cases. Accordingly, Williams may not seek relief under *Batson*. Accord, *Evans v. Cabana*, 821 F.2d 1065, 1068 (5th Cir.), *cert. denied*, 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 795 (1987); *Esquivel v. McCotter*, 791 F.2d 350, 352 (5th Cir. 1986). *Cf. Penry*, 109 S.Ct. at 2938 (finding no justification in death penalty cases for an exception to the "new rule" retroactivity analysis of *Teague*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)).

### C. Exclusion of an Anti–Death Penalty Juror

Williams next contends that the trial court excused juror Dolores Hudson for cause without adequately questioning her about her ability to perform her duty despite general reservations about the death penalty. The following colloquy occurred regarding Hudson's reservations about imposing the death sentence:

> Court: Also, whether or not, if you were on the jury, would you be able to sign—either sign a verdict which mandated the death penalty or not sign such a verdict, if the evidence so came in. Would you sign a verdict?
>
> A. Yes.
>
> * * * * * *
>
> Defense Counsel: I would like to ask you, do you have any questions you have to ask me, at this point, about the procedure about what we are about—about what's going to happen in the situation, if you are selected as a juror?
>
> A. Not really, but I would like to say one thing, and I don't know if I has a right to ask, but I have a feeling about the electric chair.
>
> Q. What feeling do you have?
>
> A. I don't like it.
>
> Q. You don't like the electric chair? Miss Hudson, do you feel that in certain

---

*Williams v. Illinois*, 466 U.S. 981 n. 3, 104 S.Ct. 2364 n. 3, 80 L.Ed.2d 836 (1984).

**21.** For example, respondents contend that the prosecution excluded many of the blacks because of certain aspects of their background. The prosecution did not peremptorily challenge white veniremembers with similar backgrounds.

**22.** There are approximately 120 inmates currently on death row in Illinois. Presumably, only a subset of those could make out a prima facie *Batson* claim necessitating a hearing. Further, their capital sentencing hearings occurred after 1977, the effective date of the current death penalty statute, so the difficulties of lost evidence and fading memories are not so insurmountable.

cases—or can you conceive of the situation where the death penalty would be an appropriate punishment?

A. I—I—I was always taught thou shall not kill, and I would feel, you know, I would sit there and—no matter what this person done, you know, to me, and I will sit there and write down that the death penalty, and I don't believe in it, you know, killing anybody, and that would be a burden on me, that my vote was in there to do this action, and I don't believe in it, you know.

Q. Well, let me ask you this.

Pros: Cause.

Def: May I—

Pros: Motion for cause.

Court: Motion for cause is overruled. Counsel, there is a motion for cause.

\* \* \* \* \* \*

Def: Miss Hudson, can you think of a situation where the death penalty would be appropriate?

Pros: Asked and answered, Judge. Her answer was no matter what the situation is.

Court: It's been asked and answered.

\* \* \* \* \* \*

Def: The State is going to be seeking the death penalty against my client. Would you be able to wait and listen to hear all the evidence before you make your decision on whether or not the death penalty should be applied?

Pros: Object.

Court: She may answer.

A. Well, just like I told you, I don't believe in the death chair, so—

Def: I have no further questions, Judge.

Tr. 2390–2410. Williams objected on the grounds that he did not have ample opportunity to question her before the court excused her.[23]

A death sentence imposed by a jury from which the court excluded members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction" must be overturned. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968). The trial court may exclude a juror if it is apparent that the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). The court need not establish the juror's bias against the death penalty with "unmistakable clarity." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The court's decision is accorded the presumption of correctness that applies to factual determinations in habeas proceedings under § 2254(d). *Id.* at 431, 105 S.Ct. at 856.

The state court judge did not improperly exclude Dolores Hudson. Despite her initial response indicating that she could impose the death sentence, her later statements strongly suggested that she would have been unable to sign a death verdict: "no matter what this person done, you know, to me, and I will sit there and write down that the death penalty, and I don't believe in it, you know, killing anybody, and that would be a burden on me, that my vote was in there to do this action, and I don't believe in it, you know." *Cf. Stephens v. Kemp*, 846 F.2d 642 (11th Cir.) *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988) (upholding the exclusion of a juror who stated first that his religious convictions precluded the taking of life but then that he could follow the law). This statement fairly supports the trial court's conclusion that Hudson's personal convictions would substantially inter-

**23.** The Illinois Supreme Court held that Williams had waived this claim by objecting on the narrower grounds that he was not given a chance to adequately question her. *Williams*, 97 Ill.2d at 288, 73 Ill.Dec. at 377, 454 N.E.2d at 237. That procedural default does not bar the claim here. It is fairly clear from the context of Williams' objection that he was concerned with

the reasons that underlaid the court's excluding Hudson. Further, the Illinois Supreme Court arguably assessed the merits of this particular claim when it discussed generally Williams' challenges to the court's decisions to exclude jurors on account of their reservations regarding the death penalty.

fere with her duties as a capital sentencing juror. We presume that Hudson's demeanor during the colloquy contributed to the trial court's impression. Accordingly, relief is unwarranted under this claim.

### D. Allegations of Prosecutorial Misconduct

■ Williams points to a number of instances in which the prosecutor exceeded the bounds of zealous advocacy and may have run afoul of the law or ethical norms. We will reverse a conviction on these grounds only if the prosecutor engaged in misconduct that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). Assessing the impact of prosecutorial misconduct on the result of a trial necessarily entails weighing the scope of that misconduct against the magnitude of inculpatory evidence presented at trial. *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986). In the context of a capital sentencing hearing, the stakes demand that we view a prosecutor's illegal or unethical behavior with greater suspicion. Viewing the prosecutor's actions together or individually, we find that reversal of Williams' death sentence is unwarranted.

■ At different times during the sentencing hearing, the prosecutor characterized some of Williams' attorney's arguments in rather strong terms and challenged Williams' veracity by suggesting his attorneys coached his responses and that Williams was stalling.[24] While repeated attempts to paint defense counsel as dishonest may rise to a constitutional violation, the prosecutor's comments here do not. For the most part, the comments constituted nothing more than statements, al-

beit sarcastic, that Williams' arguments were groundless. *Cf. United States v. Turk*, 870 F.2d 1304, 1308–09 (7th Cir.1989) (prosecutor's sarcastic reference during rebuttal that defense counsel "must be kidding" was comment on defendant's legal positions in light of overwhelming evidence against him). To the extent that any of the comments may be interpreted as personal attacks on the integrity of defense counsel, they were too infrequent in the context of a sentencing hearing that spanned several weeks and in which the prosecution presented significant aggravating evidence to create a risk that the jury's decision was altered because of them. *Cf. Dortch v. O'Leary*, 863 F.2d 1337, 1344–45 (7th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1961, 104 L.Ed.2d 429 (1989).

Williams contends that the state called Jim Robson, the foreman at Williams' trial for the rape of Aline Krone, in order to contrive an episode to lead the jury to believe that Williams was hiding evidence. Over defense objections, Robson took the stand briefly and stated only his name, occupation and that he was foreman at that trial. The state did not call him the next day for any further testimony, and Williams did not have an opportunity to cross-examine him. Williams' contention here that the state contrived this episode is unsupported. The state had a legitimate reason to call Robson—to establish the prior conviction and circumstances of that crime as portrayed at trial—and nothing in the record suggests that the state's failure to elicit his testimony the following day was an artifice. The prosecution never suggested that the jury view Robson's failure to further testify in any particular way. *Cf. United States v. Hernandez*, 865 F.2d 925, 930 (7th Cir.1989) (prosecutor's remark concerning the anonymity of a confidential informant held to be ambiguous and therefore not prejudicial to defendant).

---

**24.** After a defense objection in the state's opening statement, the prosecutor said "I don't know what they are trying to hide." Tr. 4213. The prosecutor interrupted defense counsel's opening statement and said "It's false." Tr. 3215. In closing, the prosecution referred to defense arguments as "bunk," that Williams was playing a shell game and that the jurors should not "buy it." Tr. 5483. *See also* Tr. 5018, 5022, 5028, 5036, 5071.

■ Williams further contends that the prosecution ignored court rulings when it argued that Williams should be sentenced to death in order to send a message to the community, argued that Williams had presented no psychiatric defense, stated that Williams could be paroled even if given a life sentence, argued issues not in evidence such as Williams' future dangerousness and made buzzing noises in the presence of a potential juror. Some of these actions did not constitute misconduct. Those statements that may be viewed as conscious attempts to ignore a court ruling and to exceed evidentiary bounds were infrequent in light of the volume and nature of the total evidence submitted by the prosecution. *Cf. Solles v. Israel,* 868 F.2d 242, 250 (7th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 2457, 104 L.Ed.2d 1011 (1989) (finding the outcome of the trial unaffected by repeated instances of "late disclosure, an obstinate refusal to refrain from asking leading questions or to abide by a ruling, a reference to excluded testimony, an improper remark, or a lengthy and useless examination of a witness"). In a number of instances, the judge properly admonished the jury after sustaining a defense objection. In sum, the prosecutorial misconduct did not render Williams' capital sentencing hearing fundamentally unfair.

### E. The Introduction of Life and Death Photos of Linda Goldstone

■ The state introduced a number of photographs and slides of Linda Goldstone which showed how she looked before and after Williams abducted her. Some of the pictures provide indications that Williams bound her and struck her in the face and on other parts of her body. Williams contends here that these photographs were introduced solely to arouse passion and inflame the emotions of the sentencing jury. We disagree. Williams in his testimony could not recall binding, gagging or striking the victim.[25] The state was justified in introducing these pictures as aggravating evidence in order to prove that Williams used substantial force on and physically assaulted Linda Goldstone.[26] The potential prejudicial effect of this evidence did not so outweigh its probative value on a legitimate issue as to rise to a constitutional violation. The extensive testimony of Williams and other witnesses detailed the circumstances of the crime in graphic detail. We do not believe that the pictures so inflamed the jury as to create a risk that the decision to impose the death sentence was based on whim and passion rather than a reasoned weighing of the evidence.

### F. Use of Williams' Refusal to Answer the Probation Officer

■ Immediately after his plea of guilty and before the sentencing hearing, Williams requested a meeting with Edward Swies, his probation officer. During that meeting, Swies asked Williams several questions about his crimes, and Williams responded "No comment." Swies concluded from that and other information that Williams was not sorry for the crimes to which he pled guilty. The probation officer prepared his presentence report in part from these conversations. Swies testified to this at the sentencing hearing. Williams contends that the introduction of these

---

**25.** The pertinent colloquy went as follows:
> Q: You knew that she wouldn't say anything and arouse any interest because you had bound and gagged her, didn't you?
> A: I could have.
> * * * * * *
> Q: Well, tell the jury, now, Mr. Williams, how she got that mark on the back of her neck.
> A: I don't know.
> * * * * * *
> Q: Do you know whether or not you bound her and gagged her, yes or no?

> A: No, I don't know.
> * * * * * *
> Q: If you could remember about hitting her, would you explain that to the jury?
> A: Yes.
> Q: Did you?
> A: I don't remember.
> Tr. 5064–65.

**26.** The state also used the evidence to refute Williams' statement that Linda Goldstone willingly climbed into the trunk of his car. Tr. 4140.

statements into evidence [27] violated his Fifth Amendment privilege against self-incrimination, a privilege assured in sentencing hearings as well as criminal trials. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

We find, however, that Williams knowingly and voluntarily waived his Fifth Amendment rights during that interview and cannot now challenge the admissibility of statements made therein. He requested the meeting on the advice of his attorney and presumably was aware that Swies might ask incriminating questions. He also had ample opportunity to reconsider the request. The meeting was not inherently coercive, and Swies accordingly need not have warned Williams at the beginning of their meeting that any statements he makes might be used against him. *Roberts v. United States,* 445 U.S. 552, 560–61, 100 S.Ct. 1358, 1364–65, 63 L.Ed.2d 622 (1980). *Cf. United States ex rel. Bachman v. Hardy,* 637 F.Supp. 1273, 1285–86 (N.D.Ill. 1986) (finding the court-ordered psychiatric examination of a convicted defendant in custody not inherently coercive because his attorney knew of the examination ahead of time and had an opportunity to prepare the defendant).

■ Williams additionally contends that even if he waived his Fifth Amendment right by requesting the interview, he reasserted it when he refused to comment on specific questions. Certainly, Williams may refuse to answer specific questions, and the state may not coerce a response. However, it does not necessarily follow that the state may not use Williams' invocation of his right to remain silent against him in a sentencing hearing. *Miranda* warnings were neither given nor required. Thus, there was no implicit assurance that the state would not use Williams' refusal to answer any questions at the sentencing hearing. *Doyle v. Ohio,* 426 U.S. 610, 618–19, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). Further, Williams could have clari-

fied in his own testimony or on cross-examination of Swies any ambiguous interpretations that the jury might have given to his "No comment." *Id.* at 617, 96 S.Ct. at 2244. *Cf. Roberts,* 445 U.S. at 563, 100 S.Ct. at 1365–66 (Brennan, J., concurring).

■ In any event, allowing Swies' testimony was harmless beyond a reasonable doubt. Fifth Amendment violations are subject to a harmless-error analysis. *Sullie v. Duckworth,* 864 F.2d 1348, 1356 (7th Cir.1988); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1019–20 (7th Cir.1987). In the context of a capital sentencing hearing, the Fifth Amendment protects the convicted person from incriminating himself as to the existence or severity of an aggravating factors and the nonexistence or nonseverity of a mitigating factor. In Williams' case, the only conceivable inferences from his "No comment" were that he was guilty of the crimes or that he lacked remorse. Williams already admitted guilt, and the state presented overwhelming evidence to support that admission. The state also presented significant evidence that Williams was not sorry for his crimes, the most potent having been Williams' actions during and immediately after their commission. If any juror decided that Williams was not remorseful and sentenced him to death on that basis, we consider it unlikely that Swies' statement was the determinative factor. In short, we have no doubt that the admission of Swies' statement contributed little if anything to the sentencing jury's decision to impose the death penalty.

### G. Admission of the Testimony of a Former Attorney's Law Clerk

■ The state called Kevin Breslin, a law clerk to the attorney who represented Williams during the Aline Krone rape trial, to testify that on March 31, 1978, when Williams appeared in court for that rape charge and Linda Goldstone was in the

---

27. Specifically, Williams objects to the following testimony:

Q. When you asked him about the charge for which he had pled guilty f Linda Goldstone, he didn't speak to you about that, did he?

[Swies]. He stated to me, "No comment." Tr. 4369.

trunk of his car, he discussed an unspecified procedural issue with Williams, and Williams appeared well-kempt, calm and articulate. The state used the testimony to rebut a possible contention by Williams that he acted under emotional distress when he abducted and murdered Linda Goldstone. Williams contends that the testimony violated the attorney-client privilege and his Sixth Amendment right to counsel. We disagree. Breslin did not reveal any client confidences. He did not testify as to the substance of their conversation. Williams' appearance and demeanor were not confidential within the meaning of the privilege. *Williams*, 97 Ill.2d at 295, 73 Ill.Dec. at 360, 454 N.E.2d at 240–41. More generally, the right to counsel as guaranteed by the Sixth Amendment is not significantly impaired by an attorney's testimony as to a client's disposition. Accordingly, habeas relief is unwarranted on this claim.

### H. The Exclusion of Certain Mitigating Evidence

■■■■■ The trial court disallowed Williams' request to present the following testimony and evidence to the jury: descriptions of an electrocution, that Williams would make a good subject for psychiatric research, that people of certain religious faiths oppose the death penalty and that the death penalty does not deter crime. The court also refused to let the jury view the electric chair. Williams contends that the court infringed his right to present all relevant mitigating evidence to the jury. We disagree. The court need only allow the defendant to present mitigating evidence "bearing on the defendant's character, prior record, or the circumstances of the offense." *Lockett v. Ohio*, 438 U.S. 586, 605 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978). General opposition to the death penalty and the method by which it is carried out are irrelevant. *See, e.g., Shriner v. Wainwright*, 715 F.2d 1452, 1456 (11th Cir.1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984). As to Williams' usefulness for scientific research, its exclusion was harmless beyond a reasonable doubt. *Cf. Hitchcock v. Dugger*, 481 U.S. 393, 399, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986).

### I. Denial of Williams' Request to Serve as Co-Counsel

■■■ The state court refused to allow Williams to sit as co-counsel at the sentencing hearing, thereby, Williams contends, infringing his right to counsel of choice. *See generally Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The Seventh Circuit has held that the Sixth Amendment does not provide a right to serve as co-counsel. *United States v. Trapnell*, 638 F.2d 1016, 1027 (7th Cir.1980). We see no justification for an exception to this decision in the context of a capital sentencing hearing. Adequate avenues are available for the defendant to reveal personal characteristics in mitigation, including the defendant's taking the stand. The potential disruption and confusion that often accompanies hybrid representation may significantly prejudice the defendant's case. Accordingly, the trial court's decision was not constitutional error.

### IV. Constitutionality of the Illinois Death Penalty Statute as Applied to Williams

#### A. Racial Discrimination in Application of the Statute

■■■ Williams contends the prosecution sought and the sentencer imposed the death penalty on the basis of race in violation of the Eighth Amendment and the equal protection clause. We find that Williams has waived this claim, and, in any event, that the claim fails on its merits.

Williams did not raise this claim in the state courts. In attempting to avoid the fate that the waiver doctrine mandates for this claim, Williams argues that we should excuse his procedural default since the Illinois Supreme Court would. There is no support for such an expansion of our jurisdiction. The decisions to which Williams directs our attention held only that we may assess the merits of a claim that had been

raised, but which the state courts *refused to hear* under a discretionary procedural rule. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Caldwell v. Mississippi,* 472 U.S. 320, 326–28, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Ake v. Oklahoma,* 470 U.S. 68, 74–75, 105 S.Ct. 1087, 1091–92, 84 L.Ed.2d 53 (1985); *County Court of Ulster County v. Allen,* 442 U.S. 140, 150–54 n. 10, 99 S.Ct. 2213–21 n. 10, 60 L.Ed.2d 777 (1979). Williams never even attempted to raise this claim in the state courts. Absent a showing of cause and prejudice, his failure to object constitutes a waiver without exception. *Sotelo v. Indiana State Prison,* 850 F.2d 1244, 1252 (7th Cir.1988); *Washington v. Lane,* 840 F.2d 443, 445 (7th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988).

■ Even assuming that the claim was not waived, we find that Williams' evidence in support of the claim is insufficient to form a basis for habeas relief. In support of this claim, Williams rests on two types of evidence: statistical studies suggesting racial bias in capital sentencing decisions and the prosecution's use of peremptories to exclude blacks from Williams' sentencing jury. Elizabeth Murphy at the University of Illinois analyzed 438 murder indictments in Cook County between June 21, 1977 and December 31, 1980. She demonstrated that 21% of those black or Hispanic defendants convicted of murdering a white received the death sentence as compared to only 5% of the white defendants convicted of murdering a black. Samuel Gross and Robert Mauro looked at over 3,000 reported homicides in Illinois during the same time period and showed that a person accused of homicide against a white victim is six times more likely to receive the death penalty than a person accused of the same type of homicide against a black victim. *Patterns of Death: An Analysis of Racial Disparity in Capital Sentencing in Homicide Victimization,* 37 Stan.L.Rev. 27 (1984). Finally, Hans Zeisel demonstrates that the prosecution requests the death penalty in 49% of the cases in which a defendant is convicted of murder by a jury versus only 13% of those cases in which the defendant is convicted by the judge. Williams further points out that in 1970, 77.2% of the Cook County population was white and 21.5% black; in 1980, 66.8% was white and 25.6% black.

The United States Supreme Court recently held that racial disparities evidenced by statistical analyses, however sophisticated or scientifically unassailable, are insufficient to prove that the prosecution pursued and the sentencer imposed a death penalty on account of the defendant's race in a given case. *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In order to prevail on such a claim, the defendant must present "exceptionally clear proof" that the prosecution or trier of fact acted with discriminatory intent. *Id.* at 297, 107 S.Ct. at 1769. Given the broad discretion that is constitutionally permissible in the context of the prosecution's decision to charge a defendant with a capital crime and the sentencer's decision to impose the death penalty, the Court refused to infer discriminatory intent from a statistical analysis that was equally, if not more, detailed and developed as the analyses Williams presents here.[28]

Recognizing the import of *McCleskey,* Williams additionally offers the evidence supporting his *Batson* claim—the state per-

---

**28.** The study in *McCleskey* accounted for 230 variables that could have explained the disparities on nonracial grounds and demonstrated that in over 2,000 murder cases in Georgia during the 1970's, defendants charged with killing white persons received the death penalty in 11% of the cases while those charged with killing blacks were sentenced to death in only 1% of the cases. The penalty was assessed in 22% (and sought in 70%) of the cases involving black defendants and white victims, assessed in 8% (and sought in 32%) of the cases involving white defendants and white victims, assessed in 3% (and sought in 19%) of the cases involving white defendants and black victims, and assessed in 1% (and sought in 15%) of the cases involving black defendants and black victims. In sum, in Georgia during the 1970's, black defendants who murdered white victims had a statistically significantly greater chance of being subject to death penalty proceedings and of receiving the death penalty than any others. 107 S.Ct. at 1763–64.

emptorily excluded blacks without any rational nonracial justification. Williams asks this Court to make a leap of logic that cannot be made under the *McCleskey* standard: that there is a direct correlation between how the state uses its peremptories and the questions whether the state seeks the death penalty in a racially discriminatory manner or whether the jurors that ultimately serve use racial bias. Admittedly, the unconstitutionality of discrimination in the use of peremptories hinges in part on an assumption that jurors might use the race of the defendant or the victim in its decision. However, we cannot leap from that proposition to the conclusion that the prosecution decided to seek or the jury imposed the death penalty on racial grounds. Accordingly, Williams' *Batson* evidence does not provide the exceptionally clear proof essential to this claim.

### B. The Irreconcilability of Statutory Aggravating Factors

 In the eligibility phase, the sentencing jury found beyond a reasonable doubt that Williams murdered Linda Goldstone in the course of armed robbery, aggravated kidnapping and rape, and that he murdered an eyewitness to those crimes. By virtue of this finding, the state had proven four statutory aggravating factors [29] justifying movement to the aggravation/mitigation phase and ultimately to imposition of the death penalty. Williams contends that the Illinois Supreme Court's interpretation of these factors as applied to this case renders the eyewitness factor unconstitutionally vague and overbroad.

Williams reasons essentially as follows. In *People v. Brownell*, 79 Ill.2d 508, 38

Ill.Dec. 757, 404 N.E.2d 181, *cert. dismissed*, 449 U.S. 811, 101 S.Ct. 59, 66 L.Ed.2d 14 (1980), the Illinois Supreme Court held that:

> the aggravating factor relating to a murdered individual who was, or who may be, a witness against a defendant, or who may assist in the investigation or prosecution of a defendant, does not include the investigation or prosecution for the offenses which occurred in the course of the commission of the murder offense, including the murder offense itself.

*Id.* at 526, 38 Ill.Dec. at 766–67, 404 N.E.2d at 190–91. According to Williams, *Brownell* dictates that only one of two possible results could have occurred in his case regarding the finding of aggravating factors, neither of which justified movement to the aggravation/mitigation phase. Williams contends that if Linda Goldstone was murdered in the course of the other felonies then the above-quoted language precludes a finding that he also murdered an eyewitness within the meaning of ¶ 9–1(b)(7). Conversely, Williams argues that if the murder did not occur during the course of the other felonies, then the jury improperly found the three aggravating factors under ¶ 9–1(b)(6), and improperly considered them during the aggravation/mitigation phase. The crux of these arguments is that to withstand a vagueness or overbreadth challenge the two situations must be considered mutually exclusive at all times.

Williams uses isolated language in *Brownell* to give that decision a meaning it did not have. The *Brownell* court was faced with a finding by the trial judge that the defendant's murder victim was also an eye-

---

**29.** These factors fell under the following two subsections in the Illinois Death Penalty Statute:

6. The murdered individual was killed in the course of another felony if:

(a) The murdered individual was actually killed by the defendant and not by another party to the crime or simply as a consequence of the crime, and

(b) The defendant killed the murdered individual intentionally or with the knowledge that the acts which caused the death created a strong probability of death or great bodily harm to the murdered individual or another; and

(c) The other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child; or

7. The murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.

Ill.Rev.Stat. ch. 38, ¶ 9–1(b).

witness to other felonies by mere virtue of the fact that she *could* have testified against him as to the contemporaneous felonies. The Illinois Supreme Court rejected that finding because it would lead to the untenable result that the eyewitness statutory aggravating factor

> could apply in every prosecution for murder where another offense contemporaneously occurs because the victim could have been a witness against the defendant. Or, even more broadly, this aggravating factor could apply to every prosecution for murder since every victim, obviously, is prevented from testifying against the defendant.

*Id.* at 526, 38 Ill.Dec. at 766, 404 N.E.2d at 190. The central tenet of Brownell was that the contemporaneity of the murder and the other offenses is insufficient by itself to support the eyewitness aggravating factor. The court did not purport to preclude the existence of the aggravating factor whenever there happened to be such contemporaneity.

The circumstances of Williams' crimes were materially different from those in *Brownell.* The state presented evidence and argued [30] that Williams murdered Linda Goldstone *because* she was a witness and *because* he believed she was making an effort to report the crime.[31] "By his own admission, the defendant acted as he did because he knew Mrs. Goldstone was going to report the crimes to the police." *Williams,* 97 Ill.2d at 272, 73 Ill.Dec. at 369, 454 N.E.2d at 229. The eyewitness aggravating factor was supported by more than the fact that Linda Goldstone was present at the time Williams committed the felonies. In this light *Brownell* and *Williams* are easily reconciled: When there is affirmative evidence that the defendant murdered a victim because the defendant believed the victim was attempting to report another crime, the eyewitness aggravating factor may be found even if at the time the defendant committed the murder the "other felonies" that the victim witnessed were still ongoing as a matter of law.[32] So interpreted, the factor is neither vague nor overbroad and it distinguishes in a meaningful way "the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring).[33]

---

30. Some examples from the record include:

> Q: And you were checking to see whether or not she had obeyed your supreme law of the land, Mr. Williams, and had not gone to the police but was going to the bus, right?
> Williams. Yes.

Tr. 5067.

> But remember this, she told Chester Buckowitz she needed help, and he went to call the policy; the commencement, perhaps, the beginning of the investigation by the police with regard to what was going on at 104th and Maryland. For these reasons he is eligible.

Tr. 4151.

> Something else about his statement that shows his awareness of her potentiality as a witness against him. Remember in this statement, "I want to make it as safe for myself as you want it for yourself." That's why I'm doing this. Promise not to call the police. I want to make sure you get home without attracting any type of attention. I got to take a chance that you'll get on a bus and go straight home.

Tr. 4154.

> And it is an inescapable conclusion, based upon that evidence, that this defendant is eligible ... because she was a potential witness against him ...

Tr. 4155.

31. Given the evidence and the arguments by the prosecution, we believe that the jury in all likelihood made its decision along those lines. Accordingly, the Illinois Supreme Court did not manufacture the distinction to uphold Williams' death sentence.

32. The prosecutor explained to the jury that the temporary release of Linda Goldstone did not sever the previous offenses from the murder:

> [C]ommission of those acts that he perpetrated includes not only the act itself but attempts on his part to avoid apprehension or to try and get away, to make an escape. And the act of the armed robbery, the act of the rape and the act of the aggravated kidnapping are not completed, he is still in the course of committing them. They are not completed until he has one [sic] his way to a place of safety.

Tr. 4148.

33. The Illinois Supreme Court's refinement of *Brownell* does not constitute an ex post facto law in violation of Article 1, § 10 of the Constitution. The "judicial construction of a criminal statute [is not an ex post facto law unless it] is 'unexpected and indefensible by reference to the law which had been expressed prior to the con-

## V. Constitutionality of the Illinois Death Penalty Statute

██ Under the Illinois death penalty statute, the prosecution may request a capital sentencing hearing after the defendant pleads guilty to or is convicted of murder. Ill.Rev.Stat. ch. 38, ¶ 9–1 (1977). The hearing is conducted in two phases. In the first phase, the state must prove beyond a reasonable doubt that the defendant is eligible for the death penalty—that is, the defendant was at least eighteen years of age at the time of the offense and that one or more of seven aggravating factors exist. Both sides must comply with the criminal rules of evidence in the eligibility phase. If the jury unanimously finds that the state has met its burden,[34] the second phase commences in which the state presents evidence of any aggravating factors, statutory or otherwise, and the defense presents mitigating circumstances. The statute lists five potentially relevant mitigating factors, but only by way of example.[35] The defendant may present "any aspects of the defendant's character or record, and any of the circumstances of the offense" that militate against the imposition of the death sentence. *People v. Silagy*, 101 Ill.2d 147, 164, 77 Ill.Dec. 792, 800, 461 N.E.2d 415, 423, *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). The criminal rules of evidence are relaxed in this phase. The following statutory language guides the jury in its assessment of aggravating and mitigating factors:

> If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

> Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.[36]

Under these guidelines, the jury weighs the factors presented and argued by the parties and may impose the death sentence only if all jurors agree that the mitigating factors are insufficient to preclude a death sentence. *Brownell*, 79 Ill.2d at 534, 38 Ill.Dec. at 770, 404 N.E.2d at 194. If the jurors unanimously agree that no mitigating factors exist, then the jury must impose a death sentence. *People v. Owens*, 102 Ill.2d 88, 114, 79 Ill.Dec. 663, 675, 464 N.E.2d 261, 273, *cert. denied*, 469 U.S. 963, 105 S.Ct. 362, 83 L.Ed.2d 297 (1984). However, a juror may find a mitigating factor even if the defendant presents no evidence

duct in issue …'" *Bouie v. Columbia*, 378 U.S. 347, 354, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964), *quoting* Hall, General Principles of Criminal Law 61 (2d ed. 1960).

34. The statute also provides that the defendant may waive a jury trial in the capital sentencing hearing and proceed before a judge. Williams opted for a jury trial, and we accordingly describe and assess the death penalty statute in that context.

35. The statute provides that

Mitigating factors may include but need not be limited to the following:
1. the defendant has no significant history of prior criminal activity;
2. the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution;
3. the murdered individual was a participant in the defendant's homicidal conduct or consented to the homicidal act;
4. the defendant acted under the compulsion of threat or menace of the imminent infliction of death or great bodily harm;
5. the defendant was not personally present during commission of the act or acts causing death.
Ch. 38, ¶ 9–1(c).

36. The court in Williams' sentencing hearing gave the following instructions to the jury which substantially traced this statutory language:

If, after your deliberations, you unanimously determine that there are not sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates. If you sign that verdict form, the Court must sentence the defendant to death. If, after your deliberations, you cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment.

at the sentencing hearing. *People v. Johnson*, 114 Ill.2d 170, 207, 102 Ill.Dec. 342, 360, 499 N.E.2d 1355, 1372 (1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987).

### A. Williams' Challenges to the Aggravation/Mitigation Phase

In Williams' view, the following standards govern the aggravation/mitigation phase of the capital sentencing hearing: the jury must impose a death sentence even if one juror believes the aggravating factors are insufficient to support the death penalty; the defendant bears the burden of overcoming a presumption that death is the appropriate punishment; the jury deliberates under vague guidelines; and appellate review is inadequate to assure that the jury did not consider impermissible aggravating factors. Williams contends that by virtue of these features, the Illinois sentencing scheme prevents the jury from making the individualized determination required by the Eighth Amendment and creates an impermissible risk that the death sentence is imposed arbitrarily and capriciously.

The Supreme Court's primary concern in reviewing a capital sentencing scheme under the Eighth Amendment is that the scheme satisfactorily limits the sentencing authority's discretion in order to assure that the death penalty is not imposed arbitrarily and capriciously. *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980); *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). The state must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313, 92 S.Ct. at 2764 (White, J., concurring). However, that discretion cannot be so limited as to preclude the sentencing authority from making an individualized determination in each case; that is, the scheme must allow the sentencer to consider, *"as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than

death," *Lockett*, 438 U.S. at 604, 98 S.Ct. at 2965, and to give to each mitigating factor any weight and effect that it deems appropriate. *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (O'Connor, J., concurring); Lockett, 438 U.S. at 605, 98 S.Ct. at 2965. *See also Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

There is necessarily some tension between the demand for guidelines limiting the sentencer's discretion on the one hand and the need to allow the sentencer unlimited discretion in hearing and assessing all relevant mitigating factors on the other. *Franklin*, 108 S.Ct. at 2331. *See also Penry*, 109 S.Ct. at 2941–44. A scheme may admirably satisfy one dictate but run afoul of the other. For example, a scheme that mandates a death sentence either for a specific crime, *see, e.g., Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), or when the sentencer finds the existence of specified aggravating factors and the absence of specified mitigating circumstances, *see, e.g., Lockett*, while surely reigning in jury discretion, impermissibly limits the jury's ability to consider the moral culpability of the defendant and the circumstances of the crime. The Supreme Court has declined to require that any specific feature accompany all capital sentencing schemes and instead has left it to each state to fashion a scheme that serves its own criminal justice interests while properly accommodating these Eighth Amendment concerns. Accordingly, in assessing the constitutionality of a particular capital sentencing scheme, we are admonished to view the scheme as a whole in order to assure that it neither creates an impermissible risk that the death sentence will be arbitrarily imposed nor diminishes the jury's power to spare the defendant's life on any mitigating factor. *Gregg*, 428 U.S. at 195, 96 S.Ct. at 2935.

■ We find that the Illinois death penalty statute properly guides the jury's discretion without preventing its consideration of any mitigating factors. At the outset, the eligibility phase narrows the imposition of the death penalty to those cases in which

one of seven specified aggravating factors accompanied the murder. In the second phase, the jury considers all aggravating and mitigating factors. The wide range of potential nonstatutory aggravating factors that the prosecution may present is constitutionally permissible:

> [S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime.

*Zant v. Stephens*, 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). Similarly, the defendant may present any evidence or argument as to the defendant's moral culpability or the circumstances of the crime that may militate against the death penalty.

Williams' challenges for the most part read features into the Illinois death penalty statute that simply are not there. Our consideration of these challenges must be guided by the recent decision of Seventh Circuit in *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990), which has ruled upon several of Williams' claims. First, the court in *Silagy* specifically rejected the claim that the Illinois statutory scheme imposes a burden on the defendant to overcome a presumption that death is the appropriate sentence and thereby obstructs the jurors' authority to weigh any mitigating factors as they see fit.[37] *Id.* at 997–998. The court concluded that the statute "simply guides the jury (or judge) in determining under what circumstances the death penalty should be imposed," providing for a weighing of factors that presupposes the absence of any burdens of persuasion.[38] *Id.* at 997. Thus, the jury's discretion is properly channeled into a weighing process in which presumptions and burdens of proof have very little meaning.[39]

Drawing upon this holding, we further reject Williams' argument that the failure of the Illinois sentencing scheme to assign a specific standard of proof renders the scheme unconstitutional. The Eighth Amendment does not require that the state prove the appropriateness of the death sentence beyond a reasonable doubt. Sentencing, capital or otherwise, is fundamentally different from the guilt-finding function of a trial: "[S]entencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does." *Zant*, 462 U.S. at 902,

---

**37.** Williams did not raise in the state courts his claim that the burden of proof improperly rests on the defense. However, because his other claims suggest this claim, we have addressed it on the merits.

**38.** In light of this holding, we therefore reject Williams' contention that the statute unconstitutionally allows the state to proceed first and last in closing arguments. Without any particular burden of proof, this sequence of closing arguments is not fundamentally unfair to the defendant.

**39.** In this respect, the Illinois scheme, as applied in Williams case, is different from that the Eleventh Circuit faced in *Jackson v. Dugger*, 837 F.2d 1469 (11th Cir.), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). There, the court vacated a death sentence imposed by a jury instructed as follows: "When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided." *Id.* at 1473. In Williams' sentencing hearing, the trial court instructed the jury that

> You have already determined that the defendant is eligible for the death penalty. You shall now consider any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors are those facts or circumstances which may provide reasons for imposing the death penalty. Aggravating factors include but need not be limited to, the statutory aggravating factors which you have already found.

The court merely stated that statutory aggravating factors *may* provide reasons for imposing the death penalty, not that they do as a matter of law. The jury remained free to conclude that the aggravating factors that the state proved in the eligibility phase were not enough to warrant the death penalty.

103 S.Ct. at 2756 (Rehnquist, J., concurring). Illinois has structured the aggravation/mitigation phase of the sentencing hearing not like a trial but more like the traditional sentencing scheme in which the sentencing authority considers and weighs all relevant factors to determine the appropriate sentence (subject to the limitations on its discretion as discussed earlier in this opinion). In such a case the standard of proof that the state must meet in a trial is not constitutionally essential. *Cf. Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (finding that double jeopardy applies in a sentencing hearing to which the state has *in its discretion* given certain "hallmarks" of the innocence/guilt determination—notably that the state must prove beyond a reasonable doubt that aggravating factors outweigh mitigating factors).

Williams next contends that the statutory language does not guide the jury with sufficient clarity, thereby creating the impermissible risk that the death sentence will be imposed arbitrarily and capriciously. We see no reason to doubt that sentencing juries properly interpret the statute as we have: the jurors are to weigh the aggravating and mitigating factors and may not sentence the defendant to death unless there is unanimous agreement that the mitigating factors are insufficient to justify sparing the defendant's life. The isolated phrase "sufficient to preclude the imposition of the death sentence" is not vague. It directs the jurors to consider all of the factors presented and to give each factor whatever weight they deem appropriate. The Eighth Amendment insists rather than frowns upon that kind of direction.[40]

Returning to *Silagy,* the Seventh Circuit also rejected a closely related argument that the "impact of the statute is to preclude the sentencer from determining, based on the individual characteristics of the defendant and the unique circumstances of the crime, whether death is the appropriate penalty." *Id.* at 999. Williams version of this claim is essentially identical to the one rejected in *Silagy.* Williams' interprets the following Illinois Supreme Court language as preventing the jury from sparing the defendant's life when there are no mitigating factors but the jury believes that mercy or the nonseverity of the aggravating factors militate against the death sentence:

> When there is no mitigating factor for the [jury] to weigh against an aggravating factor that has been found to exist beyond a reasonable doubt, the statute obligates the [jury] to impose the death sentence.

This argument, like the one raised in *Silagy,* fails under the recent Supreme Court decisions in *Blystone v. Pennsylvania,* —— U.S. ——, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) and *Boyde v. California,* —— U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), both of which rejected similar statutory challenges. The Illinois statute, like the ones at issue in both *Blystone* and *Boyde,* allows that mitigating factors include *any* reason not to impose the death sentence relating to the characteristics of the defendant or the circumstances of the crime. *Silagy,* 101 Ill.2d at 164, 77 Ill.Dec. at 800, 461 N.E.2d at 423. Reservations that a juror may have that are founded on general feelings of mercy or on a belief that the aggravating factors are insufficient to warrant a death sentence fall within this generous definition. *See generally Caldwell v. Mississippi,* 472 U.S. 320, 331, 105 S.Ct. 2633, 2640–41, 86 L.Ed.2d 231 (1985); *Spivey v. Zant,* 661 F.2d 464, 471 n. 8 (5th Cir.1981).

Finally, Williams sees an unconstitutional risk that the jury might impose the death sentence on an impermissible aggravating factor, such as the race of the defendant or

---

**40.** The trial court read the following instruction to Williams' sentencing jury:

> If, after your deliberations, you cannot unanimously conclude that there are no sufficiently mitigating factor or factors to preclude the imposition of the death sentence, you should sign the form which so indicates.

While not a model of clarity, this instruction was not so incomprehensible as to leave the jury without guidance. The entire set of instructions informed the jury to balance aggravating and mitigating factors and impose the death sentence only if appropriate.

the impact of the crimes on the victim's family. Williams points to the following features (or lack thereof) of the Illinois capital sentencing scheme: the statute does not define or limit aggravating factors, the jury need not expressly identify the aggravating factors that led to its decision, and there is no provision for proportionality review. In *Silagy*, the Seventh Circuit summarily rejected these arguments as "merit[ing] little discussion by this court."

First, the court rejected outright the argument that proportionality review is constitutionally required. *Id.* at 1000. In addition, the court found that the Illinois scheme adequately ensures that all aggravating circumstances relied upon by the sentencer are relevant or constitutionally permissible. *Id.* at 1000–01. With respect to aggravating factors not specified by the statute, the court cited to Section 9–1(c) of the Illinois statute, which provides:

> The court shall consider, or shall instruct the jury to consider any aggravating and any mitigating factors *which are relevant to the imposition of the death penalty.* Aggravating factors may include but need not be limited to [the statutory

aggravating factors] set forth in subsection (b). (emphasis added).

*Id.* at 1000. The court concluded that under this provision "the jury's discretion at the selection stage of the sentencing hearing is focused on that which is "relevant" to the task at hand." [41]

▉ In sum, the Illinois death penalty statute properly and clearly guides the sentencing jury to narrow the risk of arbitrariness without preventing the jury from considering and giving effect to any relevant mitigating circumstances, including a juror's personal reservations. The statute does not place a burden on the defendant to overcome a presumption that death is the appropriate sentence once statutory aggravating factors have been found. Appellate review assures, to an extent that satisfies constitutional muster, that impermissible considerations did not infect the jury's decision.

## B. Challenges to the Prosecution's Power to Request A Sentencing Hearing

▉ The statute gives the prosecution sole discretion to determine after a defendant is convicted at trial or on a plea whether to pursue the death sentence in a

---

**41.** We must acknowledge that there may be a certain degree of circularity to this reasoning. In essence, the Seventh Circuit has said that there is no unconstitutional risk that the jury will consider irrelevant, and hence, impermissible factors in aggravation because the jury is instructed to consider only those unspecified aggravating factors that are relevant. To rely on the fact that the jury is so instructed, however, is to presume that the jury knows what is and is not relevant. Yet, as Williams contends, the jury receives no affirmative guidance as to what constitutes relevant evidence. And, as Williams further contends, without any requirement that the jury expressly identify the aggravating factors that they unanimously found beyond a reasonable doubt and upon which they relied in their decision to impose a death sentence, a reviewing court has no way of knowing whether impermissible factors may have figured into the jury's determination. Thus, the problem is not that the procedure for review is inadequate. Indeed, the statute provides for automatic appeal to and review by the Illinois Supreme Court. ¶ 9–1(i). That court has expressly acknowledged its duty to review the record and assure that the jury in the exercise of its discretion did not exceed constitutional bounds:

> Our review of the entire record also considers whether there are no mitigating factors sufficient to preclude the imposition of the death sentence. There is no indication whatsoever that, in this case or any other, our scrutiny of the record and of the propriety and proportionality of sentence imposed will not be as vigorous and as observant of constitutional principles as it is required to be.

*Brownell,* 79 Ill.2d at 543–44, 38 Ill.Dec. at 775, 404 N.E.2d at 199. As Williams sees it, the problem is that there will be nothing in the record to scrutinize. See *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980) (a death penalty statute must "make rationally reviewable the process for imposing a death sentence").

Williams' concern, however, is largely overstated since the trial court is obligated to admit only evidence relevant to the sentencing determination and the jury may find aggravating factors only to the extent there is evidence to support them. The incidental risk that the jury will go beyond the evidence and additionally consider irrelevant factors was not sufficient to warrant any further discussion by the Seventh Circuit in *Silagy.* Consistent with that opinion, we therefore reject the same claim raised here that such a risk is constitutionally unacceptable.

capital sentencing hearing. Williams challenges this discretion on two grounds: (1) the discretion to seek the death penalty is unbridled and it vests in the prosecutor the judicial function of determining the appropriate sentence, and (2) the discretion to wait until after a conviction or guilty plea before formally requesting a capital sentencing hearing implicates arbitrariness concerns under the Eighth and Fourteenth Amendments. Both of these claims, however, have been expressly rejected by the Seventh Circuit in *Silagy*, at 990–994.[42]

Williams also contends that the Illinois scheme gives the prosecution certain incentives to request a capital sentencing hearing instead of the more traditional noncapital hearing before the judge because the defendant has no right of allocution or to a presentence investigation in a death penalty hearing. *People v. Gaines*, 88 Ill.2d 342, 373–78, 58 Ill.Dec. 795, 811–13, 430 N.E.2d 1046, 1062–64 (1981), *cert. denied*, 456 U.S. 1001, 102 S.Ct. 2285, 73 L.Ed.2d 1295 (1982). We do not consider these benefits to the prosecution as so critical as to impact the prosecutor's post-conviction decisions in any constitutionally significant manner. Moreover, any advantages these features offer are certainly offset by the added burden on the prosecution in the eligibility phase to prove a statutory aggravating factor beyond a reasonable doubt. The prosecution does not carry that burden in a noncapital hearing. Ill.Rev.Stat. ch. 38, ¶ 1005–8–1(a)(1)(b).

It cannot be seriously disputed that an Illinois prosecutor's decision to pursue the death sentence may in some cases be founded not only on the strength of existing proof that the death penalty is appropriate but also on undetectable personal and institutional considerations. As Williams points out, emotions generated during a particularly heated trial may carry over into the post-conviction phase. Indeed, risks of inconsistency accompany even decisions based solely on the merits of the case. *See People ex rel. Carey v. Cousins*, 77 Ill.2d 531, 559, 34 Ill.Dec. 137, 152, 397 N.E.2d 809, 824 (1979) (Ryan, J., dissenting), *cert. denied*, 445 U.S. 953, 100 S.Ct. 1603, 63 L.Ed.2d 788 (1980). However, "absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." *Gregg*, 428 U.S. at 225, 96 S.Ct. at 2949 (White, J., concurring). And as long as the United States Constitution accepts that presumption in the context of the decision to charge with a capital offense, there is no principled reason to require a state to put reigns on prosecutorial discretion merely because the decision to subject a defendant to a capital sentencing hearing is made after trial or a plea.

C. Illinois Supreme Court's Upholding the Statute on *Stare Decisis* Grounds

By the time the Illinois Supreme Court decided Williams' direct appeal, four (i.e., a majority) of the Justices had concluded in earlier decisions that the Illinois death penalty statute is unconstitutional. *Carey*, 77 Ill.2d at 544–61, 34 Ill.Dec. at 142–50, 397 N.E.2d at 816–24 (Ryan, J., Goldenhersh, C.J., Clark, J., dissenting); *People v. Lewis*, 88 Ill.2d 129, 179–93, 58 Ill.Dec. 895, 919–26, 430 N.E.2d 1346, 1370–77 (1981) (Simon, J., dissenting). Three of those Justices later indicated that since they were unable to muster a majority to strike down the statute in *Carey*, they would uphold the statute in later decisions under the doctrine of *stare decisis*. *Id.* at 165–71, 58 Ill.Dec. at 912–15, 430 N.E.2d at 1363–66 (Goldenhersh, C.J., Ryan, J., Clark, J., concurring). Presumably, they followed this position in *Williams*.

Williams now contends that their upholding the statute on those grounds violates due process in that *stare decisis* is applied

---

**42.** Williams additionally raised a Sixth Amendment challenge that the prosecutor's discretion not to notify a defendant that she will be seeking the death penalty denies defendant's right to effective assistance of counsel. Notwithstanding the fact that Williams did not fairly alert the state courts at all levels to this challenge, and accordingly has waived it for the purposes of this petition, this challenge was also rejected by the Seventh Circuit in *Silagy*, at 994–95.

arbitrarily and violates both the Eighth Amendment, in that it allows for the execution of defendants under an unconstitutional statute merely to serve the interests of stability and predictability in the law, and the supremacy clause, U.S. Const. art. VI, cl. 2, in that those Justices elevated a state judicial doctrine above the United States Constitution. While there may be some merit to the notion that the Justices of the State's highest courts should not put considerations of legal predictability and consistency ahead of their own views on the constitutionality of a capital sentencing scheme, from a practical standpoint, the notion is of no import because a defendant is ordinarily able to challenge the scheme in federal court. Further, we would be hard-pressed to strike down the statute because a majority of Illinois Justices at one time considered the statute unconstitutional on grounds with which we disagree. Unlike those four Justices, we do not find post-conviction prosecutorial discretion fatal to the scheme. Finally, and in any event, Williams has waived this claim by failing even to attempt to raise it in a supplemental brief on direct appeal or in his post-conviction petition.[43]

### VI. Conclusion

Williams has presented no constitutional basis for vacating his guilty plea or overturning his death sentence. Accordingly, the habeas petition is denied. Pursuant to Fed.R.App.P. 22(b), we hereby issue a certificate of probable cause. It is so ordered.

---

**43.** Finally, Williams contends that Illinois unconstitutionally denies defendants sentenced to death the ten years that other convicted individuals have to file their post-conviction petitions. Williams waived this claim by failing to attempt to raise it at any time in the state courts.